OPINION OF THE COURT
David J. Roman, J.
Statement of Fact
On or about November 29,1999, Mr. J., natural father of the subject child, Hayley J., date of birth August 12, 1993, filed an application for custody and/or visitation alleging that Hayley’s mother, Mrs. P., has denied visitation to him with his child. Subsequently, Mrs. P., the child’s natural mother, together with her stepfather, filed an adoption petition on February 1, 2000, as well as a cross petition for custody on or about February 16, 2000. Both petitions allege abandonment of the child by Mr. J.; as far as the court can ascertain, there have been no previous applications by either party to establish any antecedent order of custody and visitation.
These parties, however, have litigated the question of child support. The first proceeding was in the nature of a paternity action commenced in Onondaga County Family Court before Hearing Examiner John W. Allen, Esq. Mr. J. admitted to paternity of Hayley on or about January 6, 1994. An order of filiation was entered accordingly; it does not appear that a support order was ever entered because the parties resided together at that time. Thereafter, on or about October 7, 1998, a support petition was filed in this court by Mrs. P. Following a preliminary appearance, a temporary order of support was entered on December 16, 1998, directing Mr. J. to pay child support in the amount of $60 per week for Hayley. The record of proceedings indicates that Mr. J. was unemployed as of that date, but anticipated that he would be starting new employment sometime after January 1,1999. Therefore, the temporary order provided that the child support payments due thereunder were to commence on January 22, 1999. The matter was scheduled for a continuation on March 11, 1999; however, Mr. J. failed to appear on the adjourned date. Accordingly, a permanent order of support was entered upon his default which required him to pay current care support in the amount of $54.60 per week. No application to vacate the default was ever filed, nor has there been any application for modification.
*766 A payment history from the Support Collection Unit (SCU) reveals that Mr. J. has made a significant number of child support payments on behalf of Hayley. As of May 24, 2000, Mr. J. owed $1,199.70 in current support and arrears. Notwithstanding, prior to the adoption petition, Mr. J. made 20 support payments through wage deductions which totaled $1,459.42. Since on or about February 7, 2000, Mr. J. has made an additional 10 support payments to Mrs. P. which total $765.53; Mrs. P. also received additional lump-sum support payments due to the forfeiture of Mr. J.’s tax returns. These additional amounts were $488.84 and $617.94 from the New York State Department of Taxation and Finance and the Federal Internal Revenue Service, received April 13, 2000, and April 20, 2000, respectively, for calendar year 1999.
In these proceedings, the court must determine whether Mr. J. has effectively abandoned his child within the meaning of section 111 of the Domestic Relations Law, thus, obviating the need for his consent to Hayley’s adoption by Mr. P. and, otherwise, rendering moot his petition for custody and/or visitation from November 1999. Mr. and Mrs. P. have been represented in these proceedings by Robert F. Rhinehart, Esq. The court appointed Stephen W. Arnold, Esq. to represent the natural father, and Judith P. Burke, Esq. was appointed as Law Guardian for Hayley.
The court conducted an evidentiary hearing to determine the issue of abandonment. Said hearing commenced on May 3, 2000, and concluded on May 24, 2000. The court heard testimony from Mr. and Mrs. P., as well as from Mr. J., and received various items of documentary evidence. One of the arguments in these proceedings involved whether or not Mr. J. was providing child support for Hayley. Based upon a stipulation and consent of counsel, and in order to promote judicial expediency, the court took notice of the prior support proceedings which had transpired between the natural parents, inasmuch as the original support file (Docket No. F-758-98) was at the court’s disposal.
The factual determinations herein were made with due regard to the totality of the evidence presented and after appropriate weight and consideration was given to the respective parties’ testimony and veracity. Counsel for the parties were each afforded an opportunity to submit legal memoranda at the conclusion of proof; further, the court requested a confidential recommendation from the Law Guardian. The court received and considered said additional memoranda from all three counsel.
*767 Applicable Law
Perhaps the Court of Appeals said it best, when it stated that “the filial bond is one of the strongest, yet most delicate, and most inviolable of all relationships, and in dealing with it we must realize that a child is not a mere creature of the State for distribution by it” (see Matter of Corey L. v Martin L., 45 NY2d 383, 392 [1978]). The Court noted that a termination of parental rights is a drastic event which raises questions with constitutional implications and, therefore, the parent who seeks to terminate the rights of the other natural parent through adoption has a heavy burden. (See id. at 386, 387.)
Adoption proceedings are governed by article 7 of the Domestic Relations Law. The Court of Appeals in Matter of Andrew Peter H.T. (64 NY2d 1090 [1985]) examined the statutory prerequisites a natural father, seeking to bar the adoption of his child, must demonstrate, to wit, that he has: “maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum, according to the father’s means, and either (ii) the father’s visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father’s regular communication with the child or with the person or agency having the care or custody of the child, when physically and financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child” (see id. at 1091 [internal quotation marks omitted], citing Domestic Relations Law § 111 [1] [d]). “Only after the natural father establishes his right of consent to the adoption, by satisfying both the support and the communication provisions of the statute, does the court proceed to determine whether he has forfeited that right by evincing ‘an intent to forego his * * * parental * * * rights and obligations as manifested by his * * * failure for a period of six months to visit the child and communicate with the child or person having legal custody of the child, although able to do so.’ ” (See id. [citations omitted].)
Case law defines abandonment, as it pertains to an adoption, to be “such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights — a withholding of interest, presence, affection, care and support.” (See Corey L. v Martin L., supra at 391.) Abandonment must be established by clear and convincing *768 evidence. (See Matter of Shaun Christopher M., 124 AD2d 1025 [4th Dept 1986]; Matter of Ryan Paul L., 112 AD2d 47 [4th Dept 1985]; Matter of Maria S., 145 Misc 2d 99 [Fam Ct, Queens County 1989].) Abandonment will not be established as a matter of law where the biological father attempted to contact or communicate with the child and his efforts to do so were thwarted or met with interference. (See Matter of Clair, 231 AD2d 842 [4th Dept 1996], citing Matter of Shawn P., 187 AD2d 432 [2d Dept 1992].) “Payment by a parent toward the support of the child of a fair and reasonable sum, according to the parent’s means, shall be deemed a substantial communication by such parent with the child or person having legal custody of the child.” (See Domestic Relations Law § 111 [6] [d].) However, there must be a voluntary aspect to the support payments which are made.
The statute refers to a “six month period” which is used to determine whether a father has failed to visit the child or otherwise communicate with the child or person having custody during said period. (See Domestic Relations Law § 111 [2] [a].) The statute does not provide any guidance on how to measure the six-month period; however, the case law does provide some insight. The Fourth Department has consistently examined the period prior to the filing of an adoption petition. (See Matter of Joseph, 227 AD2d 974 [4th Dept 1996]; Matter of Amanda, 197 AD2d 923 [4th Dept 1993]; Matter of Ryan Paul L., 112 AD2d 47 [4th Dept 1985].) In Matter of Ryan Paul L. (supra), the Court held that the father’s “attempts, after the filing of. the [adoption] petition” to exercise his visitation rights was not significant. (See id. at 48.) However, there doesn’t appear to be any authority, statutory or otherwise, which would preclude the court’s examination of a period in excess of six months. On the contrary, in several cases before the Fourth Department, the facts demonstrate that that Court’s inquiry typically focused upon a period of time well in excess of six months. In Matter of Ryan Paul L. (supra), the Court examined a full 20-month period prior to the adoption petition. (Id. at 48.) Similarly, in Matter of Amanda (supra), the Court examined the contact and communications which were made by a father during an 18-month period prior to the adoption petition. Likewise, in Matter of Joseph (supra), the record showed that “[flor well over six months prior to the commencement of the [adoption] proceeding, [the father] made no effort to contact the child or the child’s mother and provided no support for him.” (See id. at 974.)
*769 Based upon the applicable case law, the pertinent period which must be examined is the time frame prior to the filing of an adoption, and that six months constitutes a minimum period which must be examined; however, the court is permitted to examine any additional time period which may become relevant as dictated by the facts and circumstances presented by the particular case.
Findings of Fact and Conclusions
Hayley’s natural parents, Mr. J. and Mrs. P., have had a longstanding personal relationship which predates Hayley’s birth out of wedlock on August 12, 1993. The parties continued to reside together as a familial unit until Hayley was approximately five years of age. Mr. J. left the common residence voluntarily on or about May of 1998. Nothing in the record would demonstrate that Mr. J. was not providing adequate support for Hayley during the first five years of her life, or otherwise actively participating in her upbringing during that time period. Following the parties’ May 1998 separation, however, there is not much dispute as to the fact that Mr. J. did not have much significant direct contact with Hayley. The reason(s) for said lack of contact, however, are the core of the controversy in this entire matter.
Mr. and Mrs. P. allege that Mr. J. has not taken any interest in Hayley’s education, nor otherwise been involved or attended any school functions during the last two years, despite the fact that Hayley attends first grade at the same elementary school where she had been previously enrolled in a preschool program; the last school function Mr. J. took part in was Hayley’s preschool graduation ceremony held in May of 1998. It does not appear that Mr. and Mrs. P. ever advised school officials that Mr. J. was the child’s father, nor did they themselves notify Mr. J. of school functions. There is nothing in the record to suggest that they ever encouraged Mr. J. to become involved in Hayley’s education; at the same time, there is nothing demonstrating that Mr. J.’s involvement in school activities was ever directly discouraged.
Mr. and Mrs. P.’s testimony also centered on a lack of communication from Mr. J. on significant dates, such as Hayley’s birthday and Christmas. Mr. J. apparently may have left a congratulatory balloon in her bedroom on her birthday in August 1998, but left no indication as to where it came from; he returned to the residence in September 1998, late at night to retrieve personal belongings, and on another occasion in *770 November 1998, to retrieve personal papers, but according to Mrs. P., he never requested to see Hayley. Mrs. P. indicated that she permitted him to see Hayley for a few minutes in November 1998. Mr. J. maintained that he attempted to arrange visitation with Hayley for Christmas 1998, but was told in no uncertain terms, “Go f * * * yourself’ (expletive deleted) and when he attempted to arrange for visitation after Christmas, he was met with the same response. He made no further attempt thereafter to contact Hayley or seek visitation with her, inclusive of either her birthday or Christmas of 1999. It should be noted that Mr. J. had filed the visitation petition prior to Christmas of 1999; therefore, the court does not place as much weight on the fact that visitation was not otherwise directly requested from Mrs. P. during that time frame since custody proceedings were already then pending.
There is no question that Mr. J. knew where Hayley lived, since he had lived at that very location, together with Mrs. P., for more than two years starting in February 1996; Mr. and Mrs. P. continue to reside there to date with Hayley. The telephone number to the residence remained the-same for a period of time after May 1998; however, it was subsequently disconnected and a new unlisted telephone number was obtained. Mr. J. testified that he was not provided with the new telephone number; his testimony was not rebutted by either Mr. or Mrs. P.
Of overriding concern to the court on the issue of the lack of apparent communication between Mr. J. and Hayley is the court’s perception that Mrs. P. overtly discouraged Mr. J. from having contact with his daughter. Mr. J. testified that sometime in July of 1998, Mrs. P. left a note on his car windshield while it was parked at his place of employment which directed him to stay away. The note was apparently not kept, but he claims to have recognized the handwriting as that of Mrs. P. Mrs. P. did not rebut the existence nor the purported content of this note. The court is permitted to give credence to the validity of Mr. J.’s claim, by inference, based upon the fact that this testimony was not contradicted at all on the record.
Additionally, Mr. J. testified to a telephone call which purported to be from a New York State Trooper advising him that Mrs. P. had a “restraining order” prohibiting him from having any contact with either her or his daughter. While Mr. J. could not provide any specificity regarding the name of the trooper, nor the date of the alleged conversation, Mrs. P.’s testimony does corroborate his allegations to some extent. She *771 testified to a verbal complaint she lodged with the New York State Police in the spring of 1999 against Mr. J. because he was harassing her by driving by her house all the time, revving the engine, using furtive hand gestures toward her, and otherwise disturbing the peace. She stated that she did not press any formal charges against Mr. J. and denied that she ever had an order of protection which would have prohibited contact by him.
Mr. J, creates a negative impression as he does not present as a well groomed individual, speaks with a gruff voice and exhibits somewhat of a hostile demeanor. The court suspects that Mr. J.’s appearance and demeanor is not something which has just recently manifested itself, but rather characteristic of behaviors he exhibited during the entire period he was romantically involved with Mrs. P.; however, given his occupation as an auto dismantler and mechanic, the court does not find his appearance to be terribly out of the ordinary and it is reasonable to assume that he may have driven directly to the court from his place of employment. On the other hand, Mr. and Mrs. P. present as neat, well mannered, caring individuals. Given the courtroom presence of the parties, it would be easy to see how these individuals might not be socially compatible with each other. While these facts are not dispositive, the court finds them to be nevertheless relevant to the issue of whether or not Mrs. P. actively discouraged contact between Hayley and Mr. J., and as to whether Mr. and Mrs. P. simply wanted Mr. J. out of Hayley’s life.
While reasonable minds might conclude that Mr. J. may have been in a position to effectuate more contact with his daughter, the court is concerned that during the periods in question, and in light of the fact that there was no established order of custody between the parties, Mrs. P. seems to have taken the law into her own hands and made important determinations about Hayley without regard to the importance of Hayley’s long-established relationship with her natural father. Further, the court finds Mr. J.’s testimony surrounding this purported telephone conversation with a state trooper to be credible and that he may well have been told to stay away; it is not unreasonable to conclude that he relied upon that authority since he never attempted any direct contact with Mr. and Mrs. P. or Hayley subsequent to said occurrence. Neither Mr. or Mrs. P. testified to any confrontational acts by Mr. J. following the complaint made to the State Police. Therefore, the court does not interpret Mr. J.’s driving by the residence on a recurring *772 basis as disregarding that authority, but rather simply an attempt by him to “see” his daughter.
Counsel for Mr. and Mrs. P. argues that Mr. J. failed to pay “fair and reasonable” support and that the payments which were made should be deemed as “involuntary” because they were made by wage deduction order and that Mr. J. had additional income as a result of self-employment buying and selling junk vehicles for their scrap value. As for the amount of support paid, the support order was entered in accordance with the Child Support Standards Act and based upon the reported earnings of the natural father. The record of proceedings in the support matters aré devoid of any proof proffered of self-employment income. The record before this court indicates a consistent pattern of employment by Mr. J. at A & P Auto over several years whereby he would be hired, fired and rehired on a recurring basis. His testimony demonstrates that he performed odd jobs to support himself during these periods of unemployment. However, there is nothing in the record to demonstrate by clear and convincing evidence that Mr. J. was not otherwise providing fair and reasonable support in light of his financial circumstances.
The court does not subscribe to the proposition that support payments, which are made in accordance with a wage deduction order, are automatically deemed “involuntary.” The Legislature enacted changes, under chapter 170 of the Laws of 1994, to section 440 (1) (b) (2) of the Family Court Act and section 5242 of the Civil Practice Law and Rules, which provided that the issuance of income deduction orders shall be presumptive in all child support cases such that child support payments would be made through the SCU. Therefore, since the statute provides for support payments to be made by wage deduction order through the SCU, the mere fact that payments are being made in this manner in no way creates a presumption that the payments are involuntary. Mr. J. never filed any application to affirmatively challenge either the underlying support order, or the wage deduction which resulted therefrom. The court finds it appropriate on this record to deem the support payments as voluntary. This determination is based not only upon the frequency and number of payments which have been made to Mrs. P., but also upon Mr. J.’s acquiescence to said payments through a lack of any affirmative action, on his part, to either reduce, set aside or otherwise challenge the underlying support order.
The court also notes the existence of an additional factor which serves to vitiate an abandonment finding, under the the *773 ory of an estoppel, to wit: Mrs. P. has retained all support payments during the pendency of these proceedings. Mrs. P. continues to enjoy the benefits of the child support payments made by Mr. J., while at the same time continuing to press for termination of his parental rights. In light of the relief sought, the court anticipated that, at the very least, and as a showing of good faith, current care support might have been held in escrow, pending any final determination, and there has been absolutely no indication of same.
It is procedurally significant that Hayley’s natural father filed for custody two months prior to the adoption application. Consequently, the court finds that given the support payments which have been made, together with the filing of the article 6 petition, the burden of proof is not upon the natural father, but rather upon the natural mother and prospective adoptive stepparent to prove abandonment. The court is persuaded by the analysis of the Queens County Family Court in Maria S. (supra), which held that a mother and stepfather would be unable to demonstrate abandonment as a matter of law where the natural father had filed a visitation petition and obtained a temporary order of visitation prior to the filing of the adoption petition which sought to dispense with his consent. While Maria S. does not represent binding authority upon this court, the court is inclined to agree with the analysis found therein inasmuch as the two cases are very similar.
Decision and Order
In considering the totality of circumstances presented in these proceedings which transpired prior to the adoption application being filed in February 2000, and which include the long-term relationship which Mr. J. had with Hayley of approximately five years, and the fact that Mr. J. is making support payments, albeit they are made by wage deduction, and, further, considering the State Police involvement in these matters, acknowledged by Mrs. P., which may well have resulted in Mr. J. being told by a police officer to stay away, and, finally, considering that Mr. J. has sought appropriate court intervention by filing an application for custody and/or visitation which predates the adoption application by more than two months, the court is led to the inexplicable conclusion that Mr. J. has not evinced an intent to forego his parental rights and responsibilities.
Based upon the foregoing, the petitioners have not met their burden of proof to establish by clear and convincing evidence *774 that Mr. J. effectively abandoned his daughter, Hayley. Thus, the court will not dispense with his consent to the adoption under Domestic Relations Law § 111 (2) (a). Accordingly, all parties are directed to appear on August 16, 2000, at 9:00 a.m., for further proceedings to address the pending adoption application, as well as the parties’ respective article 6 applications.